All right. Mr. Frerichs. Thank you, Your Honor. It pleased the court and my learned counsel. My father had the pleasure of arguing several times in front of this same court, and one of the early things he taught me, which I'm sure is probably not a unique thing among lawyers, is that when you have the facts, you argue the facts, and when you don't have the facts, you argue the law, and we don't have the facts or the law, you wave the bloody flag of the United States of America. And I would suggest to you that this case doesn't get to any flag waving from our perspective, because this case is grounded in the facts. What the sum and substance of the defendant or the police case in this matter is, is that if somebody says, I was raped, that's enough. You don't need to do any more further investigation that will insulate the police from any kind of claim of failing to investigate, that all it has to be is, I said I was raped, and I know the accuser. And I would suggest, and we pointed to... Counsel, that's not the facts here though, is it? No, that's clear. That's why I'm saying we were relying on the facts in this case. But what I'm saying is the facts here was there was more than just, as you say, just one allegation and then an immediate arrest. There was a process, and I'd like for you to go through that process and why it was constitutionally deficient. Sure. The process was, and I think we've laid that out, I think it's page 31 through 33 of our brief, of the things that obviously could have occurred. When the police were first alerted to this situation, it was because the mother of the victim had taken her child to go confront another boy who supposedly had showed some sexual interest in this girl, and she wanted to confront that boy. And when she confronted that boy, she wanted her daughter's phone, and her daughter said at that point, you're not going to like what you see on the phone. And what was on the phone was an accusation from another girl about her having had consensual sex with Tanner over the past weekend. In addition, the police were informed very early on that there were two people present when the supposedly sex occurred. Finally, police were made aware that the day after this alleged sexual assault, the purported victim in this case went to her best friend, who she called her rock, at work and told her in a way that was braggadocious, as if she had notched her belt with the sexual conquest of Mr. Walls. Then that following Monday, she spoke to three school officials and spoke to each of those three school officials, telling them in maybe not quite certain terms, but in very understandable terms, that this sex was consensual. And I would suggest that that beginning alone says you can't just simply rely on this adage that, look, if she can identify him and she says sex, that's enough. Well, is that accurate, though? I mean, wasn't there an interview apart from the police officers, the CPC interview? Describe that and what the effect of that is and what reliance the officers can use for the information gathered. Well, the CPC interview is interesting from this perspective. The officers had information that they knew that this woman had made previous claims that the sex was consensual. And consent, I would tell you, differentiates this case from every single rape case that has come up on a claim of an ineffective or unconstitutional argument. And we are dealing with a minor, correct? You described her as a woman, but this is a minor, female, correct? They were both minors. But she was of legal age to give consent to another minor in Iowa. She was not of legal age of consent. And that's a separate matter because, again, the case law says that if you've got a minor who's making these accusations, you need more. But going back to the CPC interview. Excuse me. All of those cases are dealing with minors, at least the ones I read, who appear to be under the age of seven. And there's a witness competency issue that's going on in those cases. It clearly isn't going on here, right? So if you look at the cases that say, well, if you're under seven, we need corroboration. That's really more about the witness's competence. So a three-year-old testifies and their description is open to interpretation. You look to other evidence in order to make that determination. Aren't those cases just entirely different? Or is there a principle there that should control here? I think there's a principle that says before you turn of legal age, you're not capable of making those same kind of decisions. Obviously, there has to be some kind of sliding scale to take into account the statement of a three-year-old compared to the statement of a 15-year-old. That's common sense. But it still doesn't reach the final hurdle, which says that, look, these are people whose minds aren't fully formed yet, whose judgment and reason is not fully formed yet. We should have some kind of corroboration. And if you look at the cases, I mean, there's corroboration in all of those cases. There's injury. There's hospital reports. There's all sorts of things that simply aren't present here. What kind of corroboration would there be in what I'll just describe as a date rape, where you're not going to have the physical injuries and no witnesses? So you really do have two people and no real physical evidence. What kind of corroboration are you suggesting the officers should be looking for before they could move forward? If there are prior statements, that those prior statements be consistent. And then they not be braggadocious, that they not be a notch in the belt, they not be telling school counselors, hey, who, by the way, are mandatory reporters? If she would have said date rape to any one of these three school counselors, they would have been under a legal obligation to report that. And they obviously didn't. So that's the kind of corroboration. If it's a consistent story, that might be enough to be corroboration. But they didn't have that here. And I want to reserve time, because I want to make sure that I address the arguments from the state, because I'm going to make a fairly egregious statement. If you look through the state's brief, they don't address a single one of the facts we laid out, that the cops knew, that the police knew at the time of this arrest. In addition, all of those police reports were purposely left out of their police report, and therefore purposely left out of the probable cause determination. Specifically, what are you referring to? Two boys that were present that say, we got invited to the house, not we invited ourselves. Two boys that say, this girl was all over him from the time that they got there, who were present. One who observed them having consensual sex during that same night, as a starter. The three people from school who said that, look, she reported this as a consensual arrangement, but she was afraid to tell her overbearing mother. Second, she told her best friends it was a consensual sexual encounter, and that she was proud of it, and that she was happy that it had happened. Those were things the police officer knew, and did not disclose during the probable cause determination. What about the cell phone? It seemed like it was disputed, at least from witnesses, who texted who or messaged whom first. Was that ever determined one way or the other by looking at the phones? No, the police purposely did not seize the phone. Purposely. They were asked to take the phone by the victim's family, and they didn't. They allowed her to screenshot what she wanted to screenshot out of it. None of which, of course, indicates either rape or consent. So let me ask then, did the screenshot say who texted or messaged whom? No, because the screenshot was from Facebook, and there was no screenshots. The only screenshot was from the girlfriend or prior girlfriend of Mr. Walls saying, hey, I heard you had sex with my boyfriend. Very nice, you know, good job. I would like to reserve the balance of my time if I could, but I would indulge your questions as well. Thank you, Mr. Frerichs. Mr. Selmans. Thank you, your honor. May it please the court, my name is Carlton Selmans, and I, with my co-counsel, Mr. Joseph Gamble, are privileged to represent the two deputies involved in this case, Randall and Quandt. Let me first answer a question posed by Judge Kelly. Judge Kelly, you posed the question of what kind of corroboration in a case like this, maybe in a she said situation, would give rise to, I took it, the probable cause to make this case more insignificant than it is. I'll answer it this way. The probable cause the police found by looking at the same report, the sexual assault nurse report done Monday night, and the probable cause independently arising from the CP's report, that Friday interview that the police watched, was more than corroborated by the statement taken of Tanner himself that afternoon. This briefing by my opponent has emphasized in and out and over again that there's been no corroboration. The strongest corroboration, like the case before us, are the lies that were told by Tanner. His parents let him talk to the police. That recording is available for you to certainly hope you do, because there's a preference for viewing the evidence most favorable to Tanner. It dissolves when you look at that video. Tanner's video explains the first half of it. He's lying outright. I was never there. I don't know her, etc., etc. But then when the police finally get him to admit what he did, the lie that he admits is even worse. And this is corroboration, Judge Kelly. The corroboration is to say, she raped me. She wanted the sex. I was forced to go along with it. She dragged me into her bedroom. She turned on the music, and she made me do it. When asked, why didn't you stop if you didn't want to be raped? Well, I was just into the moment. That's a quote, which means, of course, he could not control his body. At least two officers could believe that as surmounting probable cause evidence to believe they had the right man on the right occasion. What troubles me elsewhere here is the mix in stories, Judge Kelly, and your honors. There has been a prevalence in the briefing to mix what the officers knew when they And that's because this 14th Amendment substantive due process tort has been insinuated in here, and the discovery order by the judge allowed the depositions of both deputies to include what they thought and when they thought it, what they do afterwards, which is clearly immaterial to the probable cause. The law of this circuit is and has been, and recently reiterated in a new case decided by y'all in July, that when the officers had probable cause at the moment of the arrest, everything else subsequently learned is immaterial. Nothing has changed in that regard. I hope that answers your question, Judge Kelly. Let me go on to say that I'm also concerned about the intrusion of this substantive due process tort into the fabric of probable cause or arguable probable cause in this case. If you assume that the officers could not believe the information, the consistent information between the same nurse report and the CP interview that Friday morning that they watched, if you assume all that, and if you assume that none of that gave rise to that, it seems to me unbelievable to even view the possibility that arguable probable cause was itself absent. If you take a look at the Westby case and two of your more recent cases, I've cited one in a letter to all three of you judges under federal rule 28J talking about a recent case. I think two of you helped decide for Curiam, and that was the Matthews versus McNeil case, which was decided for Curiam precisely because what went on in Matthews and McNeil is what we have precisely going on in this case. I'm also concerned that the intrusion of this substantive due process tort, whereby the discovery order document 32 allows for a mental intrusion into the minds of the officers so that proof of some mens reis can be proved to substantiate the 14th amendment claim, is then used and turned around against the officers from what is learned to try to abrogate the probable cause that has come to exist at the moment of arrest. It seems to me what we've got here is a binary system that is not working. Binary in the sense that if probable cause exists to substantiate the arrest made at the time of the arrest, then you cannot abrogate that by claiming, oh, gee whiz, I've got some truth under the 14th amendment, these were bad actors, and they ignored partially or they ignored evidence they could have found that would have exonerated my client. Binary meaning there's either probable cause or there's not. The consequence of that, it seems to me, is to say that if there's probable cause, and I've cited this U.S. Supreme Court case in Neves, decided last year in July, I believe, that if you're going to walk into court and you're going to claim that some motive-based tort is actionable despite the probable cause, then you've got to come in and prove the absence of probable cause. Well, here's my question. In this particular situation, I sort of can appreciate that it is a bit different that when you have just two people as witnesses to the event and no other evidence, should we be looking at these kinds of cases differently and requiring anything in addition just as, you know, I'll say just, to a statement? Well, the videotape I certainly think will help, all three of you please watch it, because there you can study the demeanor of the youngster Tanner. And I understand, so you're saying then that, and I have seen that, and so you are relying then on to this degree. If you've got a young man who comes to the house, as the officers thought, for purposes of perhaps having sex, and he turns around and accuses a young woman who's never had sex of raping him and describes it in the particular terms that he did, oh, she mounted me, she wanted it, I was forced to have it, that turns around and adds a layer, I think, of truthfulness that enhances the probable cause the police already would have had if Tanner had never spoken at all. So in your view, it's a probable cause based on credibility? That certainly, yes, that certainly helps. There's no question about that, ma'am. One of the things that troubles me about this too is that this clash between the absence of probable cause or the presence of it and the difficulties that it creates when, for example, in the Neves case, they finally decided, well, if you're going to come in and prove 14th Amendment tort or First Amendment retaliatory tort, you've got to come in and say there's the absence of probable cause. Well, how do you go about proving that? It seems to me, and I've said this in my brief, maybe it was a little opaque, that if you adhere to the rules that you folks have set up requiring the pleading and proof of a constitutional tort and the violation of clearly established law, just stop there for a moment, and then you think about this case in terms of the clearly established law this circuit has made since 1987. Let me read it to you from your Matthews case. The clearly established law by about six or seven cases is that law enforcement officers are entitled to rely on information supplied by the victim of a crime absent some indication the information is not reasonably reliable or trustworthy. Well, if you enforce your injunction requiring clearly the law that my opponent must carry forward in order to be entitled to assert his case, then there is a predomination, it seems to me, of probable cause certainly for the believed to be crime and arguable probable cause that takes this case and makes it nothing less than any of the unless you have further questions of me, your honors, I'll be happy to yield the floor back to my opponents. Thank you. Mr. Farrick? Thank you, your honor. First of all, I think it's interesting that the acknowledgement about probable cause based on credibility because here you've got five statements including one made to her mother that the sex was consensual. Okay. And they ignore those. They ignore the lies. They disregard the early lies of the victim and say the lie of Mr. Walls carries the day. Mr. Farrick, I thought she ended up telling her mother that it went too far or something and that's how we ended up at the law enforcement. These are the statements and this is how it goes on. She told her that it was consensual. Everybody assumed it was consensual. And then mom found out that they did not use a contraceptive, screeched the car in the middle of the street, screamed at this young girl, and that's when the first story came out that he did it anyway. Okay. She gave no detailed statements about how the sex occurred. How did the sex occur? I was just leaning and I slept. I just don't know how it happened. She says that three or four times. And I would ask you to look at the per curiam decision. And I've got the decision that you did versus McNeil just in 2020. But that's so different because in McNeil, the cops knew that the victim was displaying behaviors consistent with having been sexually abused. None of that here. She gave a detailed account of the abuse. That didn't happen here. And there was medical evidence confirming the abuse. That didn't happen here. The medical report simply says as far as any kind of physical observation of the victim's body, it was unremarkable. So there's literally no corroboration. None. And there's clear corroboration from people they knew about. They didn't know what the two people that were there at the time were going to say, but they knew they were there. They knew what the teachers were going to say because they'd already talked to mom. Mom had already explained that to them. That, hey, she told them it was consensual. Counsel, what you're presenting, I think, would make an excellent closing argument for a trial, but I'm not sure it's all that helpful in understanding what the officers, the full picture the officers had at the time they made the decision to put this in the legal system to resolve these disputed facts. Well, the picture the picture is that they knew there were disputed facts and they ignored them. They knew that she had given five contrary stories. And while this CPC interview is going on, she's never pressed on any of those because the CPC officer doesn't really know. But the cops are in the next room with a phone and can tell them and they don't. The cops are in the next room and can say, hey, that's inconsistent with what we know from mom. Mom said that her daughter invited these boys over. None of this is consistent with what what what we understood to be the truth. And then the police never actually talked to this girl ever. Not once. She was never confronted with, well, wait a minute. Didn't you say earlier this didn't you? Are there are there procedures where they I noted that the officers made it made a point of not talking to the girl. And I assumed there was a procedure that they like to send it to the CPC since it was a minor and that they are more they're trained to to conduct those kinds of interviews. But when you send it to the CPC, you have to give them all the information. And they didn't. They purposely withheld that information from the CPC. And that's where that that's where the constitutional violations are occurring. They know evidence that the excopies, they have to give them all the evidence or just the evidence that they have that actually came from the victim. Right. Because this is a this is an alleged victim interview. And it seems to me that that if you're going to have this neutral examination and you've told the mother not to talk to the to the child anymore and and you don't want anyone to take what's out there beyond where it's already been tainted. I mean, if you come in and take the examiner, doesn't that sort of defeat the whole purpose of the objective interview by a person who's an expert in dealing with children? Even in the CPC examination, they she brings up on her own that, hey, I spoke with three people at school and told them in a way that they knew was consensual. That's why they didn't report me. They didn't they didn't report it as a rate that was in the CPC interview. Mr. Frerichs, your time's expired. The court appreciates the argument that both counsel has provided to the court in conjunction with the briefing that's been submitted in the case. We'll take it under advisement and render decision in due course.